May it please the Court, Your Honor, we're requesting a four-minute rebuttal. Four minutes, you may. May it please the Court, Patrick Dahlstrom on behalf of lead plaintiff Charles Serafin and the plaintiffs in this case, the appellants. The crux of this matter boils down to one document, and that's what I'd like to focus on with the Court. But before saying that, there are many issues. I think we've fully briefed most of them. But I do want to focus on one document and one issue that really is the basis of the judge's opinion here that we think was in error. And that has to do with what's called the May 18, 2007 letter. This is a letter that was sent to the FDA, from the FDA to BioMetric in response to a reply by BioMetric to efficiency that was raised by the FDA with respect to the protocol. The supplement was filed on April 5, 2005, and what we're dealing with here is the company's response. So May 18 was the letter from the FDA or the letter from the company? That's the letter from the FDA to the company in response to its supplement that was filed on April 5, 2007. Now, first off, this May 18, 2007 letter was not part of the complaint. It wasn't part of the complaint because these types of documents are not public. There's no way that plaintiffs could have known about this document. In fact, the way the process works, the company has the luxury to say anything it wants to investors and to the market about whatever it's doing in regard to its product. The FDA is required to remain silent because this is an ongoing process. When we filed this action, we incorporated all public documents that we could find that were related to any of the statements by the FDA. This document was presented on the motion to dismiss. We didn't challenge it because the case law is pretty clear. Letters from the government can be judicially noticed. However, the purpose of judicial notice is only for the fact that the letter was sent from the FDA and received by the party. The truth of the matters asserted in the document are not ripe on a motion to dismiss to ascertain the truth or falsity of it. But here the value of the letter is to assess the center arguments that you're making in connection with the complaint, right? That's correct. And how they conveyed to the extent they did the substance of this response. That's correct. But the point is that they received the letter. What the letter says and how it's interpreted is a matter that's hotly disputed. The court itself recognized this is hotly in dispute. So when you take notice of it, you can only take notice of the fact that the letter was sent and received. What's asserted there, the court could look at inferences for both sides. But to make a determination of what truth of this is is a different matter. That's what the court did. Now, that's a violation really of Rule 201, which says it's only supposed to be taken into consideration for indisputable facts. I'm sorry. When you say he'd made a judgment as to the truth of the letter, help me there, because it would seem to me the letter speaks for itself in terms of what the FDA said. What is the truth issue beyond the fact the FDA said it? What is in the letter, the letter doesn't speak for itself. It needs to be interpreted. Like all documents, a text occurs in context. This is within context of responding to a supplement. The first thing the FDA said is you have corrected the deficiencies in our conditional approval letter, therefore your supplement is approved. So is the truth issue what did the FDA really mean by these words? That's correct. It's what was meant by these words, because we, as I say, we didn't challenge it because it can come into the court. And we said we don't mind because we're going to make an interpretation of it that supports us. Defendants make an interpretation that supports them. But at the time of a motion to dismiss, the court can't take sides in that. It can't switch the burden and tell us, no, they're right. Prove that they're wrong. And that's what the court did. It went a bridge too far here. It went and made a factual finding about this document. The court said that defendants did have a basis for what they said and then ruled on this document in such a way that said this is what the document says. Do you have a reference to what part of the court's opinion you're speaking of? Yes. Frankly, I had focused more on what was going on in October of 2009. So if you can point me to where you think the court was erring as to the 2007. Is this around pages 17, 18? Yes, it is, Your Honor. It cites the May 18th letter in some detail on 17. On page 16 before that, Your Honor, the court is discussing this very letter and the reference the letter makes to the April 5th document. And it says, contrary to plaintiffs' argument, plaintiff did in fact have a basis to represent the defendant's argument. He did not represent that the modified intent was the primary study population approved by the FDA. We contend that's false. This letter does not represent that the primary study population approved by the FDA was modified intent to treat. In fact, this letter says it isn't. You had a chance to respond to this argument, though. Is that correct? We did in our reply because we had one chance to respond to it. And in it we made the argument to the court that this document, in fact, doesn't say what the defendants are saying. The document, the way it's written, the way it works within the context, and we had the leading expert in the process of FDA approvals who supported our analysis of the way this letter is to be read and in the context. Again, they filed a supplement in response to criticisms of the FDA. They call it the FDA's March 30th letter. We don't have that because it's never been produced. The FDA had criticisms of what was in the application by the company. The company corrected those deficiencies. Therefore, the FDA approved the protocol. Now, as part of that, the company slipped something in. They tried to redefine what is called the intent to treat. The problem with this is twofold. One, there is only one definition of intent to treat. The intent to treat is something that there's a council on international harmonization that defines topic nine. This was brought out in the advisory opinion panel. It defines it only one way. Pardon me for interrupting so that I can orient myself. You're talking about things that were put out by the defendants, which were misleading or wrong right now. Yes, I am. What is this, the October 13th releases? Is that what you're talking about? When did they make these misleading statements that you're talking about? The statements were made throughout the class period. Which ones? Doesn't the class period start October of 2009? Am I wrong? Yes. I still have the same question. You're talking about misleading statements from the company, right? Correct. I'm just asking what misleading statements? What date? What are you talking about? Are there dates for those statements? There wasn't an issue in the court report. I'm just trying to get the sequence here because, as Judge Boggs says, the class period starts October 2009. A lot of the discussion has to do with May 18th, 2007. You've got to have statements or you don't have a claim, right, really. That's correct, Your Honor. I'm not asking for exact dates. I just want to know what the nature is of these things. What are you talking about? The nature of the statements have to do with the company saying that the primary test was supposed to be the modified item. They would say that, for instance, in a press release? They said that in press releases. They also said it in a conference that defendants produced, again, on the motion to dismiss, a conference in 2009. Is that the same October 13th one? The press release is October 2009, and then there's also a conference. The conference is the same day, I think. Yes. So that's the day before the class period begins? Well, that's the beginning of the class period. It's because of those statements, the effect on the market price. Counsel, let me try this. I understand the difference or the alleged difference in the ITT and the MITT, but at the 2009 press release and conference call, it seems to me it's pretty clear that all of the data for both is released and discussed. So does your case, at least with this respect, turn on whether it's primary or non-primary? That is, they didn't hide the ITT ball. No. What they hid was they said that the MITT was what was important and what was important to the FDA. In fact, the judge cites it to himself. The analyst the next day, one of them that he cites to, said that they did give both of the information, but his last statement is, BioMedic argued that the latter mattered more than the former, the latter being the MITT. So they argued that. They argued that, and that's a misrepresentation. It was one that they knew from the very beginning of doing the first protocol until the end of the class period and beyond because the FDA kept telling them that. The FDA told them that on September 3rd of 2010, and they told them on November 17th and May 12th of 2011. I think we get the point if you want to save your time for rebuttal. May it please the Court. My name is Randall Bodner. I represent the appellees before this Court, as I did before the District Court below. I practice out of the Massachusetts Bar, but I was born in the Sixth Circuit in Danville, Kentucky. Congress passed the PSLRA, especially the requirement that the plaintiffs must plead a strong inference of cyanide to act as a filter at the earliest stage, the pleading stage, in order to screen out lawsuits such as this, frankly, that are not grounded in fact. Indeed, to that point, as the Eleventh Circuit says in Casarelli, claims based on bullish statements by pharmaceutical companies were exactly what Congress sought to avoid by enacting the PSLRA. And as this Court is well aware, the FDA approval process is well known as being a very multistage, complex process that takes years, and it's notoriously uncertain, risky, and often unpredictable. And because of that uncertainty and risk, the pharmaceutical and medical device industry, which my clients are in, is particularly subject to more than its fair share of lawsuits. And that industry, as much as any other industry, deserves the filter, the protection that the PSLRA requires. And when you apply the PSLRA filter to this case, particularly on the cyanter point, it does not pass muster at all. And let me go directly to the MITT. Just so I understand the structure of the argument, if we were to agree with you on that, would that preclude the necessity of getting to these arguments about forward-looking statements? I think, Your Honor, that we've actually... I think the forward-looking statements arguments are quite straightforward. The law in the Sixth Circuit is very clear. Look at my question. I'm sorry. If we agree with you on the first point that you were making, do we need to get to the... No. You do not. So the issue as to whether any current facts or assumptions of forward-looking, you need not reach that decision. Because even on their interpretation that the safe harbor doesn't apply, we prevail on that issue, and you need not to get into the forward-looking statement. And to address the MITT ITT point, the point is, what was the relevant study? An ITT study is only a population that a statistician can love because it involves everybody who was randomized for a drug trial. Whether they actually received, they could back out at the very beginning, they could die, they could decide on another procedure. If they've been randomized, they're in the ITT bucket in the population. Counsel, I understand why one might like MITT better than ITT. I would kind of agree with you. Yes, Your Honor. It seems to me it's pretty clear that what you've got here is both you and the FDA recognize that there are these two different populations. You've got data from both populations, and obviously you hope that everything will fly on MITT. Right. FDA, at a minimum, is saying, we want to know the ITT. Your adversary focuses on, did you assert that the MITT was the primary and that that is a big misrepresentation? Can you focus on that part of it? Absolutely, Your Honor. First off is the company did refer to the MITT, as defined, as the primary point. They referred to it throughout or in any particular key document? At various points during the class period. We don't dispute that. You did use the word primary. It's in the record. However. Your opponent is focusing on May 18th letter, so we've got that paragraph. If you want to tell us why this language, the intent to treat population, should be defined as all randomized subjects in the treatment groups, it seems to suggest that that's the primary data we want. You're given permission to deal with statistics relating to the MITT group, but they do seem to place a priority on the intent to treat population is significant on those figures rather than the MITT figures. Your Honor, to that regard, that's why in this instance, as the district court did below, you need to roll up your sleeves to see what's actually going on here because there's a little bit of a definitional confusion that the district court did understand. In fact, we don't have to rely on it. We do. We stand behind the May 18th letter. The company put in a supplemental protocol that said we want to analyze and use as the primary data population patients who actually receive treatment. That's MITT. That's not ITT. They submitted that in their supplemental protocol pursuant to FDA regulations, and the May 18th letter, otherwise known as an unconditional approval letter, said your supplement is approved, meaning your proposed protocol using that population is approved. But you need not get into a debate about what was or was not meant in the May 18th letter because you can go to the record, and it's the very briefing documents that were toward the end of the class period submitted by the FDA and put in evidence, frankly, by the appellants, not by us. You need not look any further than what the FDA says about this definitional issue as to what was the primary population, but you need to read it carefully. And I'm referring to 1874 of the record. This is... The May 10th of 2011 briefing? Yes, briefing documents. And it's 20 of 64 of the document itself, 1864. Is that when the stock plummeted, when that was put out? Well, the stock plummets because of a whole lot of issues. There was a lot of... Isn't that when the stock plummeted? The stock did go down, but stocks go down for a lot of reasons, and 10b-5 is not an investment insurance statute. I understand that, but this thing you're about to talk about is the public briefing document of May 10th. That is correct. Now, May 10th or within hours after that, the stock... That's correct. It's a very large document, and analysts track these things because of the... You know, what's the FDA thinking? I'm just asking. That is a fact. So if you look at what the FDA says, the FDA says three different analyst data sets, ITT, safety, and PP, meaning per protocol, were defined in the original statistical plan approved in the IDE, that's the submission for the protocol, with the primary analysis to be performed using the ITT data set and PP being confirmatory. Now, on its face, that doesn't seem very good to us, but you need to read on as to what the FDA was really saying here. In the very next bullet point, it says, intent to treat, all randomized subjects who receive treatment post-randomization, patients who are randomized but determined to be unable to be treated will be classified as surgical screening failures and excluded, subjects analyzed according to treatment, randomized. What they're saying here is exactly what the May 18th letter says and is exactly what the company said using the correct definition to the public, that the primary point, the word is used by the FDA itself, has to do with the population. Put together, ITT, MITT, what's the population? It's the people who receive treatment. That's an MITT population. There's no bait and switch here in any way, shape, or form. The FDA says that. They said it May 18th. They say it of 2007. They say it here in this document toward the end of the class period. They are confirming what the company said all along, which was that. The MITT population... The FDA vote where your side prevailed but there was a substantial debate. The very next day. It was two days later. Two days after this briefing document? Two days after this briefing. That's when it occurred or when it was publicized? That's when it occurred and was publicized. These are open hearings. So the briefing document is essentially the analysis that goes to the panel. Some say yay, some say nay, and in the end, you win, which is good, but you don't win by much, which is bad. Right. Well, accordingly, we lost by winning, Your Honor, according to the plaintiffs in this particular case, which I challenged them to find a case. Well, but you won only in the sense that you got to keep going. Well, we won... Certainly, I would take it that when you get a 12 to 8 approval or a 10 to 8 approval, that indicates you may have trouble down the road. Your Honor, it indicates you may have trouble down the road, but that's probably why the stock dropped. Well, it did drop when the briefing document came out because the briefing document indicates that there are questions, as does the vote. Well, the briefing documents indicated the FDA's position. That's the first time that the FDA's position in detail is publicized, and indeed by FDA policy and practice, they do not want companies and do not publicize the exchange between the companies while it's going on. So this is the first look that the market gets in detail at what the FDA is saying, and believe me, these briefing documents are huge and it covers a number of different things. The plaintiffs are cherry-picking things they like to cherry-pick out of those documents. There were many other things they can't complain about that the FDA rose, but it doesn't fit their theory of the case, that the market did not react. But it did indicate there may be trouble down the road, but certainly did not indicate that there was security fraud. Can I ask you something about the numbers? This is at page 1819 of the judge's opinion, which is page 6 of your press release. This is the paragraph where you say, on a strict intent to treat... First you say, eh, there's not that much difference, the MITT is 95 or 90 percent, right? Then the next paragraph you say, on a strict intent to treat population basis. So you're putting the data out there. What does that data mean? Usually a P with like P.004 in other statistics. That means there's a statistically significant difference. It's a big difference. In reading this, is it supposed to mean in fact that, that even on an ITT basis, your stuff did well, or is it supposed to mean that it didn't do very well? No, Your Honor, what we disclose, and what the market understands, the market, believe me, this is very closely followed by analysts, they understand what is being referred to. A P value, which is the basic measure of whether there was statistical significance or not, is it good or bad? If it's below .05, that's good. If it's above .05, that's bad. If you look at this whole thing, the bad revelation is that one of these is 6.5 rather than 5. That's not good. But the stock didn't drop at this time. Is that right? Back at the press release time? No, actually, at the time, it's back in October. We make the point in our brief. That's exactly right. It dropped some. It dropped actually quite a bit, but came back. What happened at that point, they disclosed to the market. That's why, how is there deceit when the very thing we purportedly kept from the market was in fact disclosed to the market? What we disclosed was on an MITT, the people who actually received treatment statistically significant, on the ITT, which included people who did not ever receive, they didn't even get in the operating room, but were randomized. That was statistically insignificant, albeit not by much. It was close, but not a game of grenades. And in here, it was not statistically significant. Not only that was disclosed to the market at the time, there was a press conference. And what did the company say in that press conference? The head of the guy in the know, the head of regulatory affairs, Dr. Russell Progano, told the market that, because the market was, well, is it ITT? Is it MITT? His answer to the market, it's both. It's both. Okay, so your view kind of is at worst. Everybody knew that both of these were in play. You hoped that the FDA would rely more on MITT because you had some basis for that. Others would say they also wanted ITT, so you knew that you could be in some trouble because of that. Is that fair? Well, I think, Your Honor, the way I would put our position is that there could not be any strong inference of scienter here when the very thing we were accused of keeping from the market, we disclosed to the market. In referring to the MITT as the primary data point, all we're doing is using the correct definition, but the substantive definition that the FDA uses in its own briefing document. But you knew there was a potential problem. You were just hopeful you would end up overcoming it. Well, of course we were hopeful we were going to overcome it. And you said this is the data. Everybody can buy or sell on it. And not only that, Your Honor, 133 times we counted during the class period we warned the market, the FDA may interpret this data different than we are. It is a fortuitous process. We gave specific risk disclosures to say that there is risk here, and very well they could interpret the data very differently than we did. Are these 133 press releases and discussions or what? Some are with press releases. Others are disclosed risk factors in the cues in the case the public SEC found. Is there a particular place we should look at in the record to where you say 133, or is this just a count you made before oral argument? It's a count that we made before the district court. We actually have an attachment in the record. Can you cite to that, or can you tell us where it is? I mean, we can find it if we have to. Is it part of your summary judgment? It's part of our motion to dismiss brief, and it's an attachment to the motion. All right. We can probably find it. And the district court references it, although it said I didn't do the counting myself, but I basically take their word for it. All right. One thing that bothers me, we're supposed to evaluate what the company knew at the time of various statements. May 18th letter was first produced apparently in briefing before the district court. Is that right? That is correct, Your Honor. And there have been other communications from the FDA to the company that are presumably in possession of the company but haven't yet been disclosed that would come out during discovery. How are we supposed to know whether the strong inference of Sienter is inference that is at least as plausible as the innocent inferences that might be? How are we going to measure that without knowing what the company had been told along the way by the FDA? Well, first, Your Honor, not to be glib, but that's what the PSLRA and the Supreme Court in TALABS says. The second is that I think the court can take great comfort in the fact that what the May 18th letter says is actually, in the briefing documents, say the same thing. It's not May 18th now. We've got that. Right. So as a result, and it's a difficult exercise for all courts, but it's what the PSLRA requires and it's what TALABS mandates. It is the court at this stage to apply the filter is to see whether or not the plaintiffs have made a strong inference of Sienter. And to do that, the court must, not may, must under TALABS conduct a comparative evaluation of the inferences to be drawn, fraudulent versus non-fraudulent, as to whether the plaintiffs have met their burden. That's the mandate both from Congress and the Supreme Court, and that is exactly what this district court did appropriately here. Thank you. Thank you. You have your four minutes for rebuttal. Thank you, Your Honor. I'd like to first address this issue that the definition that the company was using was the same as the FDA's. In the same document, this executive summary at page 50, I'm sorry, at page 23 of the executive summary, and this is the May 12th document, the FDA says It's May 12th or May 10th? It's May 12th, 2011. But May 12th was the briefing document released. I'm sorry. This is the same briefing document, though? He referred to it as a 64-page document. Yes. Okay, sorry. It's the same document. Go ahead, whatever the date. The FDA says that the ITT population as defined in the PMA should be considered the primary analysis. That's what the FDA believes. In addition, FDA advised the sponsor at the IDE stage that both analysis populations should be supportive of non-inferiority. Note, the ITT population preserves the randomization. They were saying this from the beginning, that you had to have the ITT. What you just quoted is we told them that both needed to be supportive? Needed to be supportive. Isn't that somewhat contrary to the May 18th letter, which says analyze one and you can analyze the other? No, what it means is that you needed to have statistical significance for the ITT population. That's what it means. And what the company said throughout here, and especially at that conference, is they were telling the analysts who do follow this, that's why they were telling me, they were asked about the ITT and they said that the FDA was more interested in the NITT. That's the primary one. That's the important one. They were making the arguments at that conference the same kind of arguments they're making here today. The conference call. The conference call, yes. And they also say in the same 64-page document at page 50, as was introduced in the statistical plan section, the sponsor used the following populations for analyses of primary effectiveness point in the PMA. This was a change from the approved IDE protocol and was implemented without our approving the change from the FDA in an approved modification of the IDE. It was never approved by the FDA. How does that square with, you know, it's an accurate statement of the letter that it says it is approved, right? It's unconditionally approved. Again, if you read it, what they say is you have corrected the deficiencies. Now this also, before you say unapproved, that's their term. The document is not an unapproved letter. It doesn't mention that, or unconditional. It doesn't say that anywhere in it. What it says is you have corrected the deficiencies cited in the conditional approval letter. Therefore, your supplement is approved. It goes on to say, and neither the defendants nor the court cites this language, you should give serious conditions to the following items, which are considered essential for the analysis of your data for the purposes of determining safety and effectiveness. Essential. It doesn't say this is some recommendation we want you, or you, we. If the data is essential, they provided it. The question is how much you weigh one or the other, or which one you look at and which one you don't look at. That's correct. And it goes on to say the intent to treat population should be defined as all randomized subjects in the treatment. What they're claiming here, they keep pointing and saying, oh, this is what the ITT is, is a misstatement. They misstated what ITT means. ITT is not a modified ITT. It's not this thing they put in this, what is a bait and switch that the FDA caught in the protocol. ITT has only one meaning, and that's the randomization before the testing. And those are the words that they use in the press release on a strict intent to treat population, blah, blah, blah, and they release those figures, right? Right. And there's no such thing as strict or not. As Dr. Blumenthal says, it's like pregnancy. There's no modified, you're not modified pregnant. It is or it isn't. Dr. Blumenthal was on the advisory panel and was, if you read through the advisory panel minutes. That's one of the things he's saying during that debate. He did most of the analysis. He's not an FDA employee. Which way did he vote? He voted no on all of this. He said you didn't have the studies. You don't have the proper studies. And just one last thing, if I can. I'm sorry. I have a question. I know your time is up. Can you explain in layman's terms, that is so a high school student could understand it, why ITT is more probative for safety than MITT? Yes. Because once you start, as soon as you start taking people out of the programming, before you start the testing, you're putting in bias. You're saying we don't want these people. Remember, this is not a blinded test. So you're taking out people. It's cherry picking. You're cherry picking individuals who will be in the test. But how do they get in there in the first place? Well, there's a recruitment process where doctors have to review the people and see if they satisfy the requirements for the test. It's not completely blind. It's people who are appropriate for the test. Well, no, the test is blind. The individuals they know going in need to have this medical, either to use the device or an autograph. They also have to, can't have. Why can't you have on a non-biased basis, this is just the high school student asking a dumb question here. Why can't you have just on a basis that's not related to which of these two products you use, take out the people who never get either one of them? The high school student is asking. What's the answer to that? The answer to that is when you take it out, you change the way the statistics work when you're testing to see if it's effective or not. Even though they did not use it, and I take it, like if they died, if they died after they were randomized in, they're still in the ITT. They're not in the MITT. Is that fair? That's correct. But what that does, again, what the statisticians are talking about here is that when you start removing people from the process, bias comes in. How are you removing these people? Why are you removing them? The other thing is you have to remember when you randomize. It's putting them in. Well, no. That's what I was going to ask. Somehow they got into a pool of people, right? That's correct. But the way they get into it, there's a series of questions. In other words, you don't put a person into the pool who doesn't need a graft. Right. So you put them in, and then you don't take them out of the pool if they don't. That's correct. You can take them out of the pool because it turns out they don't need one. But when you start, once you have the study and you start taking people out who could receive the procedure, then you have to ask, why are you removing these people? No one has agreed on what those determinations are. How, in layman's terms, could that introduce a bias? They were removed. Some of them were removed because they might have used one rather than the other. I just don't follow. I'm trying. I just don't see it. I believe they're the experts. I'm sure they have a good reason. I understand. I'm just asking if you can convey to me what their reasoning is. The way the randomization works, Your Honors, you have people who are going to get this new procedure, and people are going to get what is the accepted norm, the regular grafting. Randomization is we don't look at who's going into either category. We put them into this. Now, once they're in there, then you can make a determination. They may have fallen out of the graft and not this autograft. Counsel, is it fair to say that the reason you don't want to take anybody out, even if there's a very good reason, is there might be a bad reason? The ITT is no matter how good the reason for taking them out is, you don't want to let the clinical trial people make that choice because they might make a bad choice. That's one of the reasons. But there's also a mathematical reason in terms of what I'm trying to explain. Once they're in one of the two categories, they may fall out. But when you say you're taking them all out, then the autograft is automatically going to look better. And the problem with the test was when you compared the augment process to the regular grafting process after they took everybody out, if only one of the people who took the graft was positive rather than negative, it would have made the autograft, the augment product, not statistically significant. So when you start removing people, you're putting bias in, but you're also taking robustness out of the analysis. Now we have, yes, we've met statistical significance, but if one person would have changed, then we wouldn't have. Well, had it been... That's always the case. No, but... I mean, it's always the case that there's a line. If you think .05 is the perfect line, there's always going to be a situation where one person getting better or worse would move you one way or the other. That's correct, but the way it worked here is one would have made it not statistically significant, and the reason for that was because they removed people without randomization. They took them out of the process. Had they left it in with randomization, it would have been a different result. Is it fair? There was a statement somewhere in there that anybody who was removed who never got the treatment is considered as an automatic failure under ITT. Is that correct? That's correct. If I could just... I think your time is up. Unless my colleagues, I'm happy to... Anything further? You've also appealed the denial of reconsideration for the filing of an amended complaint. Had your amended complaint been accepted, what was the cure? Give me your two claims of misrepresentations that you believe have been now adequately set forth in the amended complaint. We were submitting additional testimony and facts about how to interpret the May 18th letter, how it fits into the process. Where in the record would we find the proposed amended complaint? We'll get the number for you. And it starts with page 62 of the second amended complaint. Those are the new statements. Okay. All right. Thank you, counsel. Thank you very much, Your Honor. The case will be submitted. The remaining cases will be submitted on briefs.